## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

**UNITED STATES OF AMERICA**

**v.**                                  **NO.  4:97-CR-00243-(1) GTE**
                                    **(Civil Case No. 4:04-CV-493)**

**CHEVIE O'BRIEN KEHOE**

### <u>MEMORANDUM OPINION</u>

      Before the Court are Petitioner Chevie Kehoe's Motion to Set Aside, Reduce or Vacate

Sentence under 28 U.S.C. § 2255,[1] Amended Motion to Vacate, Set Aside or Correct Sentence,[2]

and Supplemental Amended Motion to Vacate, Set Aside or Correct Sentence.[3]  The United

States filed a collective Response opposing any post conviction relief.[4]  Petitioner filed a Reply

Brief.[5]  Petitioner also filed an Addendum to its Supplement to Amended Motion to Vacate.[6]

Additionally, Petitioner filed a Response and Amended Response to the Court's Order filed May

15, 2008.[7]  Finally, the Government filed a Reply to Petitioner's Response to the Court's Order

of May 15, 2008.[8]

---

[1] Doc. No. 1039, hereinafter referred to as "original motion."

[2] Doc. No. 1067, hereinafter referred to as "amended motion."

[3] Doc. No. 1069.

[4] Doc. No. 1087.

[5] Doc. No. 1115.

[6] Doc. No. 1125.

[7] Doc. No. 1157 and 1159.

[8] Doc. No. 1160.

The Court has considered carefully the above pleadings.  Additionally, the Court has undertaken a review of the relevant portions of the voluminous record in this matter.  Based upon its careful consideration of all issues presented, the Court concludes that Petitioner is entitled to no relief.

## I.   BACKGROUND

Simultaneously with the filing of this Memorandum Opinion, the Court is also filing a separate Memorandum Opinion addressing the § 2255 motion filed by Chevie Kehoe's co-defendant Danny Lee.   Significant portions of the Memorandum Opinions are the same, as they address many similar or identical arguments for relief.

### A.   Procedural History

On July 7, 1998, Chevie Kehoe ("Kehoe"),[9] Daniel Lewis Lee ("Lee"), and Kirby Kehoe ("Kirby")[10] were charged in a seven-count Superseding Indictment.[11]  Kehoe and Lee were both charged in all seven counts.  Count 1 charged all three defendants with racketeering in violation of 18 U.S.C. § 1962(d).  Count 1 alleged ten racketeering acts, of which Lee was charged with four, specifically, the Mueller family murders/robbery and the Spokane City Hall bombing (racketeering acts 4, 5, 6, and 7 of Count 1).  Kehoe was charged in all ten racketeering acts. Count 2 charged all three Defendants with a racketeering conspiracy in violation of 18 U.S.C. § 1962(d).  Counts 3, 4, and 5 of the Superseding Indictment charged Kehoe and Lee with murder in aid of racketeering in violation of 18 U.S.C. § 1959 alleging that they murdered William

---

[9]   Throughout this opinion, "Kehoe" refers to Chevie Kehoe.  To avoid confusion, the Court will refer to other members of the Kehoe family (primarily, Kirby, Gloria and Cheyne Kehoe) by either their full names or their first names only.

[10]   Kirby is the father of Chevie Kehoe.

[11]   A fourth defendant, Faron Loveless, was charged in the racketeering count in the original Indictment. The Government dismissed Loveless prior to filing the Superseding Indictment.

Mueller, Nancy Mueller, and Sarah Powell, Nancy Mueller's eight-year-old daughter.  Count 6 charged all three Defendants with a robbery conspiracy in violation of 18 U.S.C. § 1951(a) for the second robbery of the Muellers.  Count 7 charged Kehoe and Lee with the use of a firearm in the Mueller robbery and murders in violation of 18 U.S.C. § 924(c).

Before trial, Kirby pled guilty to racketeering as charged in Count 1.  Also before trial, the Government dismissed Counts 6 and 7.  The Government pursued the death penalty against both Kehoe and Lee.

The trial began on March 1, 1999.  A single jury was selected to hear both the guilt and, if necessary, the penalty phases for both Defendants.  On May 4, 1999, the jury found Kehoe and Lee guilty of the five remaining counts in the Superseding Indictment.  As to Count 1, Kehoe was found to have committed all of the alleged racketeering acts with the exception of those for the robbery in the first degree of Jill and Malcolm Friedman, money laundering, first degree murder of Jeremy Scott, and first degree arson related to the Spokane City Hall bombing.  Also as to Count 1, Lee was found to have committed the three racketeering acts associated with the murder of the Mueller family, but was found not to have committed the racketeering act related to the Spokane City Hall bombing.

Kehoe and Lee's sentencing phases were conducted separately, with Kehoe's sentence determined first.  The jury sentenced Kehoe to life without possibility of release for each of the three murders.  The jury then sentenced Lee to death for each of the three Mueller murders.  On June 25, 1999, this Court imposed on Kehoe a Judgment of Life without possibility of release on Counts 3, 4, and 5, and Life Imprisonment on Counts 1 and 2, to run concurrent.[12]

---

[12] Doc. No. 864.

Both Kehoe and Lee appealed their convictions.  The Eighth Circuit Court of Appeals affirmed Kehoe's conviction.[13]  The Supreme Court denied Kehoe's certiorari petition on May 19, 2003.[14]  On May 17, 2004, Kehoe filed his original motion for § 2255 relief.  On July 1, 2005, he filed his amended motion for § 2255 relief.

### B.      Facts Supporting Conviction

#### 1.      The Enterprise – the Aryan People's Republic

The Government alleged that Defendants formed an "enterprise" known as the Aryan People's Republic, the Aryan People's Resistance, or the Aryan People's Revolution ("APR").  More specifically, the Government alleged that Chevie Kehoe was the leader of the enterprise and that Danny Lee, Cheyne Kehoe,[15] Kirby Kehoe, and Faron Loveless were principal assistants.  Kehoe conceptualized the enterprise based in part on Robert Matthews's group, known as "The Order."[16]  The group believed that whites were the chosen race,[17] that Jews were the devil's children and should die,[18] and that the Bible justified violence.[19]  Kehoe was so concerned with

---

[13]  *United States v. Kehoe*, 310 F.3d 579 (8th Cir. 2002).  Lee's conviction was also affirmed.  *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004).

[14]  *Kehoe v. United States*, 538 U.S. 1048 (2003).

[15]  Cheyne Kehoe is one of Chevie Kehoe's brothers.

[16]  Tr. 1317-18. (Unless otherwise noted, the transcript referenced is the trial transcript beginning on February 26, 1999, and continuing through May 14, 1999).  Matthews's activities are described in a book authored by him entitled "The Silent Brotherhood."  Tr. 1310.  Chevie gave a copy of this book to Lee and to others.  Tr. 1310, 4964.

[17]  Tr. 1316, 1433.

[18]  Tr. 1433-34.

[19]  Tr. 1435.

racial purity that at one point he contemplated killing his own wife and children because of suspicions that his wife's blood was tainted with Indian blood and therefore impure.[20]

The purpose of the enterprise was to establish an Aryan Homeland for the benefit of the white man, free of "mongrel races," in the Northwest United States.[21]  Kehoe envisioned that his group could assume control in the aftermath of chaos created by simultaneously killing large numbers of judges and law enforcement officials.[22]  He hoped to raise enough money to buy a remote piece of property to set up a training camp and to attract more members.[23]

## 2.    1995 Mueller Burglary (Racketeering Act 1)[24]

William Mueller, his wife Nancy, and eight-year-old Sarah lived in Tilley, Arkansas. William Mueller was a gun show enthusiast who had strong anti-government views.  The Mueller family and the Kehoe family became acquainted through gun shows when the Kehoe family lived in Arkansas.[25]  Gloria Kehoe developed a friendship with the Muellers.[26]

In February 1995, Kehoe stole a trailer near Harrison, Arkansas, and pulled it to the home of his parents near Kingston, Arkansas.[27]  On February 12, 1995, Chevie and Kirby Kehoe went to the Mueller home while the Mueller family was attending a gun show.[28]  They robbed the

---

[20]  Tr. 1440.

[21]  Tr. 1319-20, 1375-76.

[22]  Tr. 1320-21.

[23]  Tr. 5370.

[24]  Danny Lee was not charged in this racketeering act.

[25]  Tr. 4950.

[26]  *Id*.

[27]  Tr. 1760, 4951.

[28]  Tr. 4952-54.

home and divided the stolen property.  Chevie Kehoe took some of the stolen property to

Washington state.  Kirby later became angry at his son, believing that Chevie had shorted him his

share of the proceeds from coins that Chevie sold in Washington state.[29]

### 3.        Friedman Kidnaping and Robbery (Racketeering Act 2)[30]

On June 12, 1995, Faron Lovelace kidnaped and robbed Malcolm and Jill Friedman at

their home outside of Colville, Washington.[31]   Chevie and Kirby Kehoe dropped off Lovelace

near the Friedman's home before the robbery.[32]   After robbing them of approximately $15,620,

two guns, and a bottle of tequila, Lovelace had the Friedmans drive him to Spokane, Washington,

where he stole their car and left them at a restaurant.[33]   Lovelace was then picked up by Kehoe

and Cheyne, who drove him from Spokane to Idaho.[34]   Kehoe knew the Friedmans from his

youth, when he worked for them both in their grocery store and in their home.[35]

Lovelace gave $15,000 of the money stolen from the Friedmans to Chevie Kehoe, who

kept $13,000 and allowed Lovelace to keep $2,000.[36]   Chevie later gave Kirby $4,000.[37]

---

[29]  Tr. 4955-56.

[30]  Lee was not charged in this racketeering act.

[31]  Tr. 4139-47.

[32]  Tr. 4963.

[33]  Tr. 4143-47.

[34]  Tr. 5299-5301.

[35]  Tr. 4137.

[36]  Tr. 5300-02.

[37]  Tr. 4963.

Between June 18 and July 11, 1995, Chevie Kehoe and his wife used some of the proceeds from the robbery to purchase five acres of land near Priest River, Idaho.[38]

### 4.    The Mueller Family Murders (Racketeering Acts 4-6; Counts 3-5)

Sometime after Christmas in 1995 or early January of 1996, Chevie Kehoe and Lee[39] left Spokane, Washington.  They told friends that they were going to Idaho to build a barn,[40] but instead traveled to Arizona where they met Kirby and Gloria Kehoe ("Gloria").[41]  After a brief stay in Arizona, Kehoe and Lee left for Oklahoma.  Kehoe told Gloria that he was taking Lee to see Lee's mother because Lee did not have transportation or money to make the trip.[42]   Lee's mother lived in Yukon, Oklahoma (near Oklahoma City) and had undergone emergency gall bladder surgery.[43]

On January 10, 1996, around 6:00 p.m., Kehoe and Lee left Lee's mother's house in Oklahoma.  Lee's mother gave them as much as $40.00 before they left town because they were low on cash.[44]  Kehoe and Lee were driving Kehoe's blue 1985 GMC diesel truck, which he had purchased from his parents.[45]

---

[38]  Tr. 4189-97, 4199.

[39] Sean Haines, Danny Lee's former roommate, testified that Chevie and Lee first met at his apartment in late August or early September in 1995.  Tr. 2773, 2776-77.  Lee moved in with Chevie in April of 1996.  Tr. 2791.

[40]  Tr. 2778-79, 2898.

[41]  Gloria Kehoe is the mother of Chevie Kehoe.

[42]  Tr. 5126-27, 5132-33.

[43]  Tr. 2617-18.

[44]  Tr. 2618-20.

[45]  Tr. 5127.  The Court notes a minor discrepancy in the record regarding the GMC's model year.  Gloria repeatedly referred to it as a model year 1985, but Cheyne described it as being a model year 1984.  Tr. 5356.  The Court does not know which is correct.

On or about January 11, 1996, Kehoe and Lee broke into the Tilley, Arkansas home of William Mueller, Nancy Mueller, and Sarah Powell.[46]  Kehoe and Lee were dressed in raid gear that gave the impression that they were federal law enforcement officers.  When the Muellers returned home, Kehoe and Lee emerged from hiding and pretended to be federal law enforcement officers.  They had to physically subdue William Mueller who strongly resisted.  They suffocated the Muellers by placing plastic bags over their heads and using duct tape to secure the plastic bags.[47]  There was evidence that Lee was unwilling to kill Sarah, the little girl, so Chevie killed her.[48]  After killing the Muellers, Kehoe and Lee transported their bodies to Pope County and threw the bodies into the Illinois Bayou.[49]

Kehoe and Lee took cash, coins, numerous firearms, firearm parts, gun display cases, and ammunition from the Mueller home.  Kehoe estimated the value of the cash and gold taken to be $50,000.  He estimated the value of the firearms and firearm parts to be to be $30,000.  For his part in the crime, Lee received $3,000 or $4,000 and a pistol.[50]

Kehoe and Lee returned with the stolen property to the Shadows Motel in Spokane, Washington, a place where Kehoe stayed off and on.  The evidence established that they were back in Spokane no later than January 14, 1996, at 5:59 p.m., when Lee called his mother.[51]

Kehoe explained the large quantity of guns, gun parts, and cash in his possession to Jeff

---

[46]  While the exact date of the murders was disputed at trial, there was substantial evidence to support the Government's theory that the Mueller family was murdered on January 11, 1996.

[47]  There was testimony that Kehoe and Lee shocked the Muellers with stun guns, causing them to pass out, before suffocating them.  Tr. 4974.

[48]  Tr. 5328.

[49]  Tr. 5327-29.

[50]  Tr. 5330.

[51]  Tr. 2610, 2620-22.

Brown, manager of the Shadows Motel, by stating that the guns and gun parts were on consignment from a dealer.[52]   Kehoe later provided a similar explanation to Cheyne.[53]

On February 4, 1996, Gloria arrived at the Shadows Motel from Arizona and saw a large quantity of merchandise in her son's room.[54]  During a trip to the grocery store, Kehoe confessed to Gloria that he "put Bill and Nancy on a liquid diet."[55]  He then proceeded to tell Gloria in detail how he and Lee murdered and robbed the Muellers.[56]  Later, at the motel, Lee also confessed his involvement in the murders to Gloria.[57]

On February 13, 1996, a man named Travis Brake was arrested in Seattle, Washington, and the police confiscated a .45 caliber Colt pistol from him.[58]  The pistol was later linked to a .45 caliber Colt box belonging to the Muellers.[59]  Brake testified that he purchased the gun at a gun show from an older man, a young man, and a young boy.[60]  This information led investigators to the gun show where Brake had purchased the gun and then to the Kehoes at the

---

[52] Tr. 2894-98.

[53] Tr. 5319.

[54] Tr. 4969-70, 5603, 5138.

[55] Tr. 4971.

[56] Tr. 4971-74.

[57] Tr. 4975.

[58] Tr. 3190.

[59] Tr. 3165-66, 3176-77.

[60] Tr. 3182.

Shadows Motel.  Records revealed that "K.M. Gumm" (Chevie Kehoe's wife)[61] rented tables at a gun show in Seattle over the weekend of February 11, 1996.[62]

On June 28, 1996, the bodies of the Mueller family were discovered.  A woman fishing near a bridge that crossed the Illinois Bayou snagged two tennis shoes tied together with "something that was flapping around extending from it."[63]  This discovery prompted a dragging operation that led to the recovery of portions of the bodies of William Mueller, Nancy Mueller, and Sarah Powell.  Plastic bags were duct taped around the heads of all three bodies.  One body was recovered with a large rock duct taped to it.  The condition of the bodies indicated that rocks had been similarly placed around the other two bodies, by folding their arms over the rocks and then using duct tape to secure the rock to the body.[64]

In late June or early July of 1996, Kehoe had his 1985 GMC diesel truck –  the vehicle that he and Lee took to Arkansas when they murdered the Muellers –  painted white.[65]  He then traded the vehicle to his father.[66]

On December 10, 1996, Sean Haines, Lee's former roommate, was arrested in South Dakota with a Bushmaster rifle in his possession.[67]   The rifle had been reported stolen and was

---

[61]   While Karena Kehoe, a/k/a Karena Gunn, was Kehoe's wife and the mother of his children, Kehoe briefly had a second wife.  From August through November of 1995, Kelly Kramer lived with Kehoe and Karena in Priest River, Idaho, in a polygamous relationship.  (Tr. 4251-52, 4256-57, 4267).

[62]   Tr. 3178-79.

[63]   Tr. 3074-75.

[64]   Tr. 3104, 3118.

[65]   Tr. 3044-56.

[66]   Tr. 5356.

[67]   Tr. 2794.

registered to the Muellers.  Sean Haines told police he acquired the rifle from Chevie Kehoe.[68]

Haines called Lee and informed him police were questioning him about the rifle.[69]   Lee told

Kehoe about Haines's arrest.[70]  On December 11, 1996, the day after Haines was arrested, Kehoe

and his family left the R.V. park in Spokane, Washington, where their motor home had been

parked.[71]  Lee left for Oklahoma.[72]

### 5.   Ohio Shootings (Racketeering Act 9)[73]

After leaving Spokane, Kehoe, his wife Karena, and their three children arrived in Yaak,

Montana, with their motor home and blue Suburban.[74]  Kirby and Gloria were living there.  Also

living there were Cheyne, his wife Tanna, and their baby.  Shortly thereafter, Kehoe's and

Cheyne's families left in the motor home, pulling the blue Suburban behind them.  They planned

to travel to Arizona to look for construction work.[75]  Before leaving, Cheyne accompanied his

brother to a storage unit in Old Town, Montana, where Kehoe filled the Suburban with guns,

ammunition, and miscellaneous gun parts.[76]

---

[68]  Tr. 2794-98.

[69]  Tr. 2799.

[70]  Tr. 4978-80.

[71]  Tr. 4469-73.

[72]  Tr. 4980.

[73]  Lee was not charged in this racketeering act.

[74]  Tr. 5317.

[75]  Tr. 5317-20.

[76]  Tr. 5318.

Kehoe and Cheyne attended gun shows in Phoenix and Tucson, Arizona.[77]  While selecting a gun to sell at one of the shows, Kehoe remarked to Cheyne that he needed to get rid of a particular shotgun because it was "one of the Muellers' guns."[78]

The two families traveled from Arizona to Galveston, Texas.  By then they had decided to go on the "gun show circuit," rather than find construction work.[79]  While in Galveston, Kehoe told Cheyne that the guns, parts, and accessories in his possession had belonged to the Muellers.  Kehoe then confessed to Cheyne that he and Lee had murdered the Muellers.  Kehoe provided considerable detail about the manner in which the crime had been committed.[80]  He also showed Cheyne the raid gear he and Lee had worn.[81]

After leaving Galveston, the two families traveled through Alabama, Florida, North Carolina, and West Virginia, before heading back west.  They arrived in Ohio on January 21, 1997.[82]  While in Ohio, Kehoe arranged to meet Lee in Greensboro, Kentucky, but Lee failed to show.[83]

On February 15, 1997, Kehoe and Cheyne were on their way to the campground where they were staying when they were stopped by law enforcement officers in Wilmington, Ohio. The traffic stop escalated into a shoot-out.  Cheyne exited the truck and exchanged gunfire with a

---

[77]  Tr. 5321.

[78]  Tr. 5323.

[79]  Tr. 5325.

[80]  Tr. 5326-30.

[81]  Tr. 5329.

[82]  Tr. 5332-33.

[83]  Tr. 5342.

Clinton County, Ohio deputy sheriff.  Following the shooting, Cheyne fled on foot and Kehoe jumped into the blue Suburban and drove away.[84]

Shortly after the first shoot-out, a city police officer located the blue Suburban, with Kehoe inside, parked a short distance away.[85]   As the officer exited his vehicle, Kehoe opened fire on the officer and another officer who arrived at the scene.  Kehoe fired approximately 33 rounds.[86]   A civilian bystander was shot in the arm.[87]  Kehoe escaped on foot.

A search of the Suburban revealed, among other things, federal officer raid jackets, FBI caps, bullet proof vests, guns, various gun parts, ammunition, holsters, handcuffs, and duct tape.[88]  In one of the caps, a hair was found that was later determined to be microscopically similar to Lee's hair.[89]

Following the shoot-out, Kehoe and Cheyne eventually reunited with their families with the help of Kirby and Gloria.[90]  Kehoe and Cheyne decided to flee together.  Kirby agreed to help them get a vehicle.  Kirby sold the 1985 GMC truck, the paint on which had been changed from its original blue to white, back to Kehoe.[91]  After registering the GMC truck in Idaho, Kehoe and Cheyne traveled with their families to Arizona and then to Utah, where they meet a rancher

---

[84]  Tr. 5343-48.

[85]  Tr. 4568-69.

[86]  Tr. 4573-76, 4594-95, 4612.

[87]  Tr. 4600-04.

[88]  Tr. 4633-98 (Officer who conducted search of Suburban describing vehicle contents).

[89]  Tr. 4722.  The Court notes that Lee was recently excluded as the source of the hair from the "raid cap."

[90]  Tr. 5354-56.

[91]  Tr. 5356.

named Rod Leavitt.[92]   Kehoe and Cheyne agreed to take care of Leavitt's alfalfa ranch in Beryl

Junction, Utah, so they moved there with their families.[93]

### 6.       Cheyne Kehoe's Surrender

Chevie Kehoe was upset about losing so many firearms and accessories in the aftermath

of the Ohio shootout.  While in Utah, Kehoe discussed with Cheyne the possibility of murdering

Kirby and Gloria in order to acquire Kirby's weapons and ammunition.  Kehoe also commented

that he could then take his other brothers, raise them, and use them as recruits for the APR.[94]

Cheyne, having become fearful of Kehoe, decided that he was going to leave his brother.

In June 1997, Cheyne, his wife and child took Kehoe's GMC truck and left the Utah ranch.  On

June 16, 1997, after stopping to see his parents in Yaak, Cheyne turned himself in to local

authorities in Colville, Washington.[95]

An FBI forensic chemist later determined that paint samples taken from the GMC truck

were "consistent, very similar" to metallic blue paint chips found in duct tape removed from the

bodies of the Mueller family.[96]

On June 17, 1997, Chevie was arrested in Cedar City, Idaho.

### 7.       Gloria Kehoe's Cooperation

In early March 1998, Gloria contacted ATF agents in Spokane and began cooperating

with the authorities.  She was concerned that her husband, Kirby, would kill her because "she

---

[92]  Tr. 5357-60.

[93]  Tr. 5368.

[94]  Tr. 5374.

[95]  Tr. 5374-76, 5378.

[96]  Tr. 3658-60, 3678-84.

knew too much."[97]  Gloria provided information that prompted the authorities to search two rental storage units – one in Thompson Falls, Montana, and the other in Old Town, Idaho.

On March 6 and 7, 1998, an ATF agent searched a storage unit at Thompson Falls, reported by Gloria to have been rented by Kirby.[98]  Inside the unit were large quantities of guns, hand grenades, grenade parts, a machine gun, assault weapons, and over 30,000 rounds of ammunition of various calibers including armor piercing ammunition.  Also found were a Maddi AK-47 gun, which had been registered to Nancy Mueller[99] and some Black Hills ammunition, which was determined, by matching serial numbers, to previously have been sold to William Mueller.[100]

In April of 1998, the authorities searched a storage unit in Old Town, Idaho, reported by Gloria to have been rented by Chevie Kehoe.[101]  Among the items found in the search were two display cases similar to those used by William Mueller.  The cases had fibers in them similar to the carpet in the Mueller home.[102]  One of the cases had a hair similar to William Mueller's in it.[103]  Fingerprints were found on one of the display cases that were determined to have been left by Kehoe and Lee.[104]  Other items seized included personal papers belonging to Kehoe and his

---

[97]  Tr. 3476-77, 4980.

[98]  Tr. 3377-78, 3478.

[99]  Tr. 3385, 3401-02.

[100]  Tr. 3390-92, 3527-30.

[101]  Tr. 3479-80.

[102]  Tr. 3646-50.

[103]  Tr. 3651-52.

[104]  Tr. 3708-12 (The fingerprint analyst testified that he found three matching fingerprints for Lee and one for Chevie).

wife, Karena, a Rubbermaid container filled with Mueller property, and white supremacist and survivalist literature.[105]

### 8.    Strength of the Evidence

The Court has outlined some of the evidence linking Kehoe and Lee to the Mueller murders in part to demonstrate the abundance of evidence supporting the guilt phase convictions. Those bare facts alone can not convey the demeanor of the witnesses who testified, the scope and detail of the Government's evidence, or the general overall tenor of the case against Kehoe and Lee.  Over almost ten weeks of trial, the Government produced voluminous evidence supporting Kehoe's guilt.  This was not a case in which the Government's evidence was weak or hinged solely upon the believability of one or two critical witnesses.  Rather, in the Court's view the evidence presented against Kehoe at trial was very strong.  Consequently, the Court must disagree with Petitioner Kehoe's assertion that "the issue of who killed the Mueller family was closely contested."[106]

## II.    DISCUSSION OF PRELIMINARY ISSUES

Petitioner Chevy Kehoe asserts that he is entitled to post-conviction relief.  His claims fall into one of the following categories:  (1) ineffective assistance of counsel;  (2) denial of Sixth Amendment right of confrontation;  (3) prejudice by denial of a severance; and  (4) cumulative error.

Before taking up the merits of Petitioner's claims, the Court will address several preliminary issues.

---

[105]  Tr. 3479, 3610-28.

[106]  Am. Mot., at p. 26.

### A.    No Need for a Hearing

In considering a petitioner's challenge to his federal custody under § 2255, the Court is required to grant a prompt hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."[107]  The Government contends that Petitioner has failed to allege facts which justify a hearing.  The Court agrees.  The Court's determination is based upon a review of the complete record in this matter, including relevant portions of the voluminous trial transcript, and the absence of the necessary offers of proof supporting Petitioner's claims.

More particularly, Petitioner has failed to include supporting affidavits or other independent support for those persons whom he contends should have been called to testify at trial.  Likewise, he has failed to offer support for the contention that certain witnesses who were called should have been cross-examined differently.  He contends that the failure to call said persons as witnesses or to cross-examine certain witnesses differently constitutes ineffective assistance on the part of his counsel.  The Court specifically concludes, under such circumstances, that it is not required to conduct a hearing to permit the "discovery" of the testimony of the numerous witnesses whom Petitioner contends should have been called to testify or who should have been cross-examined differently.[108]  Even accepting Petitioner's description of how such witnesses might have testified, the Court still concludes that no hearing is required.

### B.    Time-Barred Claims

The Government notes that Petitioner has raised several issues in his amended motion which were not raised in his original motion.  The Antiterrorism and Effective Death Penalty Act

---

[107]  28 U.S.C. § 2255.

[108]  *See Kafo v. United States*, 467 F.3d 1963 (7th Cir. 2006)*; Porcaro v. United States,* 832 F.2d 208, 212-13 (1st Cir. 1987) (per curiam).

of 1996 (AEDPA) establishes a one-year statute of limitations for § 2255 motions for post conviction relief.[109]  Petitioner filed a petition for writ of certiorari to the United States Supreme Court, which was denied on May 19, 2003.  He had one year from that date within which to seek relief under § 2255.  Petitioner filed his original motion on May 17, 2004, two days before the expiration date.  However, his amended motion was filed July 1, 2005, well beyond the one-year limitations period.  The question arises whether the issues first raised in the amended motion are timely filed and properly before the Court.

Habeas proceedings under § 2255 are civil in nature and therefore controlled by the Federal Rules of Civil Procedure.[110]  In considering whether those claims raised by Petitioner for the first time in his amended motion "relate back" to his original motion, the Court must apply Fed. R. Civ. P. 15(c)(2).

Rule 15(c)(2) states that a claim relates back when it arises out of the same "conduct, transaction, or occurrence" as the original claim.  The Eighth Circuit has held that "if the ineffective conduct alleged by [Petitioner] in the first petition cannot be said to have arisen out of the same set of facts as his amended claim, his amendment cannot relate back and his claim must be time-barred since it was filed after the statutory period of limitation."[111]

---

[109] *See* 28 U.S.C. § 2255(f).

[110] *Mandacina v. United States*, 328 F.3d 995, 1000 & n.3 (8th Cir.), *cert. denied*, 540 U.S. 1018 (2003); *United States v. Hernandez*, 436 F.3d 851, 856-57 (8th Cir. 2006).

[111] *United States v. Craycraft*, 167 F.3d 451, 457 (8th Cir. 1999).

Because the rationale of Rule 15(c) is notice, Petitioner's original motion must provide notice of the theory upon which all relief, including that asserted in the untimely filed amended motion, is predicated.[112]

The Eighth Circuit has consistently rejected a broad definition of the relation back test in the habeas context.[113]   The Court finds that the following allegations are time-barred because they were not pled in the original petition and do not "relate back" within the meaning of Fed. R. Civ. P. 15(c):

   (1)   Counsel's alleged failure to adequately investigate or to seek forensic testing with respect to hair or fingerprint samples from other suspects (excluding Faron Lovelace), paint chips, duct tape or "flex cuffs";[114]

   (2)   Counsel's alleged failure to discover and to present evidence that Kehoe had disavowed his "Christian identity beliefs";[115]

   (3)   Counsel's alleged coercion and intimidation of Petitioner not to testify;[116]

---

[112]   *Id.* ("The rationale of Rule 15(c) is that a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitation were intended to provide.") (omitting internal quotations and citations).

[113]   *See Hernandez*, 436 F.3d at 857-58 (finding that claim of ineffective assistance of counsel on cross-examination in amended petition did not relate back to claim of ineffective assistance of counsel for failure to object to admission of evidence contained in original petition); *Mandacina*, 328 F.3d at 1002 (finding that an amended claim of ineffective assistance of counsel for failure to investigate did not relate back to an ineffective assistance claim for failure to discover evidence that was filed in the original motion because the allegations in the amended motion were not similar in "type" to the original claims, even though both referred to a generally similar time period - conduct prior to trial).

[114]   Am. Mot., at pp. 44-46; Resp. at pp. 39-41.   Similar allegations related to counsel's failure to investigate Faron Lovelace's involvement in the crimes and to seek forensic examination of rocks are not time-barred.

[115]   Am. Mot., at pp. 47-48; Resp. at pp. 42-43.

[116]   Am. Mot., at pp. 54-55; Resp. at pp. 54-55.

(4)     Counsel's alleged error in jury selection by failing to inquire "about specific race bias";[117]

(5)     Court's denial of a severance;[118]

(6)     Counsel's failure to discover and present evidence of Kirby Kehoe's personality as a leader.[119]

(7)     Counsel's alleged failure to adequately cross-examine Cheyne Kehoe.[120]

As to any of the allegedly time-barred issues not listed above, the Court has considered and rejected such issues on the merits whether or not such issues are specifically discussed herein.  Additionally, the Court has also considered the merits of several of the time-barred issues listed above and finds all such issues to be lacking in merit.  The Court's discussion of such issues does not mean that those issues are not time-barred, only that the Court has elected to discuss them.

Equitable tolling may permit relief from a statute of limitations bar in certain "extraordinary circumstances" but such relief requires a greater showing than the "actual innocence" used to overcome procedural default.[121]  Petitioner has made no effort to justify his untimely filed claims with an "actual innocence plus" showing.  Accordingly, it is unnecessary to consider whether equitable tolling might apply to save Petitioner's untimely filed claims.

---

[117] Am. Mot., at p. 54; Resp. at pp. 52-53.

[118] Am. Mot., at pp. 60-61; Resp. at pp. 55-58.

[119] Am. Mot., at pp. 43-44; Resp. at pp. 38-39.

[120] Am. Mot., at pp. 32-24; Resp. at pp. 24-27.

[121] *Flanders v. Graves*, 299 F.3d 974, 976 (8th Cir. 2002) (omitting citations and quotations).

### C.      No Actual Innocence Claim

Relying on *Schlup v. Delo*,[122] Petitioner asserts that newly discovered evidence shows that

he is actually innocent of the murders of the three members of the Mueller family.[123]  He further

contends that to the extent that the newly discovered evidence demonstrates his actual innocence,

no reasonable juror would have found him guilty beyond a reasonable doubt.

While Petitioner has asserted actual innocence based on newly discovered evidence, such

claim is completely without merit.  In his amended motion, Petitioner asserted that he had

discovered new evidence which placed Kirby in locations outside of Arizona and in Arkansas

during the time period the Mueller family was murdered.  Such evidence, if true, would have

disproved Kirby's alibi.  Petitioner's argument was originally supported by documents found in

Kirby's wallet.  Petitioner subsequently acknowledged that the only documents of any potential

significance were Kirby's VA Patient Data Card and a VA Medical Center Appointment Card

showing that Kirby had an appointment at the VA Medical Center in Fayetteville, Arkansas, on

February 1, 1996.  Petitioner subsequently recognized that those documents were of little or no

value because further investigation revealed that Kirby did not keep his scheduled

appointment.[124]  Further, in response to this Court's May 15, 2008, Order to produce the newly

---

[122]  513 U.S. 298 (1995).

[123]  Am. Mot., at pp. 22, 24-26.  Petitioner's "actual innocence" claim focuses solely on the Mueller murders.  No claim of actual innocence is made with respect to the other charges of which Petitioner was found guilty.

[124]  *See* Addendum, Doc. No. 1125.

discovered evidence,[125] Petitioner acknowledged that the specific item referred to has never been located and is not in the possession of the defense team.[126]

Petitioner has failed to come forward with any other evidence that would place Kirby in Arkansas during the relevant time frame or any other new evidence sufficient to support an actual innocence claim.  Thus, there is no actual innocence claim for this Court to consider.

## III.     INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

### A.     Legal Standard

To establish an ineffective assistance claim Petitioner has a heavy burden since courts "indulge a strong presumption that counsel's conduct falls within the wide range of professionally reasonably assistance and sound trial strategy."[127]  To prevail, Petitioner must not only establish that his attorneys' performance was constitutionally deficient, but he must also demonstrate that he was prejudiced as a result of that deficient performance.[128]  Indeed, courts are not required to analyze the performance prong if they determine that the petitioner suffered no prejudice as a result of the allegedly deficient performance.[129]  Furthermore, "reasonable trial strategy does not constitute ineffective assistance of counsel simply because it is not successful."[130]  As pointed out in the leading case of *Strickland v. Washington*,[131] the distorting

---

[125]   Doc. No. 1154.  The evidence is described in Docket No. 1066 (sealed) at p. 2, ¶ A.13.  As noted in the Court's Order, the Court describes the evidence generically because Petitioner's filing describing the evidence was sealed.

[126]   Doc. No. 1157.

[127]   *Driscoll v. Delo*, 71 F.3d 702, 706 (8th Cir. 1995).

[128]   *United States v. Robinson*, 301 F.3d 923, 925 (8th Cir. 2002).

[129]   *Pryor v. Norris*, 103 F.3d 710, 713 (8th Cir. 1997).

[130]   *Graham v. Domire*, 212 F.3d 437, 440 (8th Cir. 2000).

[131]   466 U.S. 668 (1984).

effects of hindsight must be avoided and courts "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."[132]  In evaluating counsel's conduct "judicial scrutiny of counsel's performance must be highly deferential."[133]

Counsel's conduct is deficient if it falls "outside the wide range of professionally competent assistance."[134]  Counsel's performance will be considered objectively unreasonable if "counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would use under like circumstances."[135]  Absent the requisite showing, courts "will presume attorneys provide[d] effective assistance and will not second-guess strategic decisions or exploit the benefits of hindsight."[136]

When considering the prejudice prong the Court must decide whether the Petitioner has established "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different."[137]  The Supreme Court has cautioned that "to set aside a conviction or sentence solely because the outcome could have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him."[138]  The Petitioner must show some effect of the challenged conduct on the reliability of the trial process.

---

[132]  *Id*. at 690.

[133]  *Id*. at 689.

[134]  *Id*. at 690.

[135]  *Battle v. Delo*, 19 F.3d 1547, 1554 (8th Cir. 1994).

[136]  *Henderson v. Norris*, 118 F.3d 1283, 1287 (8th Cir. 1997).

[137]  *Strickland*, 466 U.S. at 694.

[138]  *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993).

Otherwise, the Sixth Amendment guaranty is generally not implicated.[139]  A Petitioner's failure

to show prejudice is dispositive.  In other words, absent a showing of prejudice a court need not

address the reasonableness of counsel's performance.[140]

   With this standard in mind, the Court considers some of the numerous ways in which

Petitioner's counsel's performance allegedly fell below the standard of representation to which

Petitioner was entitled under the Sixth Amendment.  The Court has considered and rejected each

and every allegation of ineffective assistance of counsel timely asserted by Petitioner on the

merits, whether or not such allegation is discussed in detail herein.

   **B.**  **Errors in Failing to Call Certain Witnesses**

   Petitioner argues that his counsel erred in failing to call certain witnesses to testify at trial.

"The decision not to call a witness is a virtually unchallengeable decision of trial strategy."[141]

However, counsel's failure to interview a witness or to discover mitigating evidence may be a

basis for finding counsel ineffective within the meaning of the Sixth Amendment right to

counsel."[142]

   Even assuming that counsel's failure to discover mitigating evidence or to present an

exculpatory witness was constitutionally deficient, a petitioner still needs to "make a substantial

showing that, but for counsel's failure to interview [or to call] . . . the witness[ ] in question,

there is a reasonable probability that the result of his trial would have been different."[143]  To

satisfy the prejudice prong, it is not enough to speculate as to what the witness might have said, if

---

[139] *United States v. Cronic*, 466 U.S. 648, 658 (1984).

[140] *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996).

[141] *United States v. Staples*, 410 F.3d 484, 488 (8th Cir. 2005) (internal citations omitted).

[142] *Kramer v. Kemna*, 21 F.3d 305, 309 (8th Cir. 1994).

[143] *Id.*

- 24 -

interviewed or called to the stand. Rather, the petitioner must present independent evidence, by affidavit or otherwise, as to what the witness would have said if he or she had been interviewed or called to testify.[144] Absent such independent evidence, prejudice can not be found without speculating that the outcome of the trial might have been different. Such speculation is "simply inadequate to 'undermine confidence in the outcome.'"[145]

Petitioner has failed to provide even one affidavit from the myriad of witnesses whom he claims should have been interviewed or called to testify. Such omission is arguably fatal to any finding of prejudice. Moreover, even accepting as true Petitioner's description of the omitted testimony, the evidence in this case overwhelmingly supported the jury's finding of guilt, and the Court can not find that the outcome would have been different if such persons had testified as Petitioner speculates.

With these principles in mind, the Court considers Petitioner's specific contentions.

## 1.    Barbara Koroghlian

Barbara Koroghlian, William Mueller's sister, testified at trial as a Government witness.[146] Petitioner argues that his counsel were ineffective for not recalling Koroghlian to the stand to have her explain a statement allegedly made to one of Kehoe's counsel, Tom Sullivan, after she left the witness stand. Petitioner claims that Koroghlian told Mr. Sullivan that her brother had commented to her that "he had seen them in town" earlier in the week before he disappeared. Petitioner argues that such testimony was exculpatory to him, regardless of whether

---

[144] *See Sanders v. Trickey*, 875 F.2d 205, 210 (8th Cir. 1989) (holding that an appellant who filed a section 2255 motion indicating that an uncalled witness "might" have testified appellant was innocent but produced no affidavit from the witness in question or any other independent support for his claim failed to show prejudice).

[145] *Id.* (quoting *Strickland*, 466 U.S. at 694).

[146] Tr. 2214-48.

William Mueller was referring to him and his co-defendant Lee or to someone else.  Petitioner argues that the evidence is either newly discovered evidence inconsistent with Petitioner's guilt, or alternatively, that trial counsel were ineffective in failing to recall Koroghlian to testify at trial or during Petitioner's motion for new trial.

Petitioner has not presented an affidavit from Koroghlian or any other person to support the alleged statement to Mr. Sullivan.  The Government, on the other hand, has presented an affidavit from Koroghlian.  Therein, Koroghlian states that the last conversation she had with her brother was on Christmas Day, or shortly before Christmas Day, 1995, when she called to wish him a Merry Christmas.  Kroghlian stated: "I have never had any conversation with my brother where he referred to "them" where I understood my brother to be talking about any member of the Kehoe family or Danny Lee."[147]

Koroghlian's undisputed affidavit is dispositive of any claim of ineffective assistance based on defense counsel's failure to investigate the alleged statement or to recall her to the stand.  The Court must assume that Koroghlian, if recalled, would have testified as stated in her sworn affidavit.  Such testimony would not have helped Petitioner's case.

## 2.    Faron Lovelace

Petitioner claims that Faron Lovelace offered to testify for the defense and that Lovelace "would have identified Kirby Kehoe and others, including Lovelace, as having committed the offenses" alleged in the Superseding Indictment.  Again, Petitioner has not provided anything other than bare assertions as to what specific testimony Lovelace would have provided.  The Government has tendered the affidavit testimony of Mark Hampton, one of Petitioner's trial counsel.  With regard to Lovelace, Hampton states:

---

[147]  Affidavit of Barbara Kroghlian, Exh. B to Govt.'s Response.

Trial counsel had numerous interviews with Faron Lovelace. In those interviews Lovelace asserted that he could prove persons other than our client, Chevie Kehoe and co-defendant Danny Lee had committed the murders of the Mueller family. However, Mr. Lovelace refused to state what this testimony would be. Mr. Lovelace also advised Judge Eisele that he could identify the true murders. [sic] This resulted in an in camera meeting with Judge Eisele where trial counsel was advised of Mr. Lovelace's assertions. The decision was made not to call Mr. Lovelace as trial counsel had no knowledge regarding what Mr. Lovelace's ultimate testimony would be. It also was obvious that Mr. Lovelace was not mentally stable. Counsel felt that presenting Lovelace as a defense witness would possibly compromise the defenses being permitted. The matter was discussed with defendant Kehoe.[148]

Additionally, the Government points out that it, too, had extensive interviews with Lovelace, as Lovelace also offered himself as a Government witness who could testify regarding many of Petitioner's crimes. Government attorneys reached the same decision as Petitioner's attorneys – that Lovelace was too unstable to be called as a witness in the case.

The decision of Petitioner's counsel not to call Lovelace was clearly a legitimate and prudent trial strategy. Additionally, Petitioner has failed to establish *Strickland* prejudice. There is no evidence of the specific testimony that Lovelace, if called, would have given, and no basis for finding such testimony would have altered the outcome of the trial.

### 3.    David Hill

Petitioner claims that David Hill "saw men in early February, 1996, unloading rolls of carpet from a van and dumping them over the side of the bridge over the Illinois Bayou where the Mueller family was recovered."[149]   Petitioner points out that unidentified carpet fibers were recovered from the bodies of the Mueller family. Such testimony, Petitioner argues, would have supported the defense theory that the Mueller family was actually killed in late January or early February.

---

[148]  Affidavit of Mark Hampton, Exh. A to Govt.'s Resp., at ¶ 1.

[149]  Am. Mot., at p. 38.

In response, the Government has tendered affidavit testimony from one of Petitioner's counsel indicating that defense counsel were aware of Hill's potential testimony, that they interviewed Hill, and that they determined that Hill's testimony would not aid the defense.[150]

The Court concludes that Petitioner's counsel's decision not to call Hill was a legitimate trial strategy. Additionally, Petitioner has failed to establish *Strickland* prejudice.[151]

### 4.      John Sholz

Petitioner contends that his trial counsel were ineffective for failing to call John Scholz. Petitioner alleges that Scholz contacted defense counsel and advised them of a prior attempt on William Mueller's life after he objected to the manner in which a white supremacist group, of which William Mueller was a member, wanted to raise money.   Petitioner states that Scholz told defense counsel that approximately one year prior to Mueller's disappearance he and another individual had gone to the Mueller residence for the purpose of killing him, but that he was not at home, so they aborted the plan. Scholz was not called as a witness.  Petitioner argues that such testimony was consistent with the defense theory that persons other than Petitioner and Lee could have murdered the Mueller family.  Such testimony also would have demonstrated William Mueller's association with members of the Ku Klux Klan and his support of their general beliefs.

The Government contends that the decision not to call Scholz was made after investigation and was a reasonable trial decision.  In support, the Government has tendered an affidavit from Petitioner's trial counsel explaining their decision not to call Scholz as a witness based on their conclusion that the story was too incredible to be believed and that the development of anticipated evidence on cross-examination might discredit their case.[151]

---

[150]   Affidavit of Petitioner's Trial Counsel, Exh. A to Govt.'s Resp., at ¶ 2.

[151]   *Id.* at ¶ 3.

This claim fails both the "performance" and "prejudice" prongs for ineffective assistance of counsel.

### 5.    Other witnesses

Because Petitioner has made no showing of what "other witnesses" were available, how they would have testified, and why such additional evidence would likely have affected the result, he has failed to prove either that counsel's assistance was ineffective or prejudicial to his defense.

### C.    Inadequate Cross-Examination of Witnesses

Petitioner claims that his trial counsel were ineffective in their cross-examinations of key Government witnesses Gloria and Cheyne Kehoe either because they failed to properly impeach the witness or they failed to elicit testimony favorable to Petitioner during cross-examination.

To succeed on this challenge, Petitioner must show his counsel's cross-examination of these key witnesses fell bellow professional standards of competence and that such deficient performance prejudiced his defense.[152] As the Eighth Circuit has noted:

> The cross-examination of a witness is a delicate task; what works for one lawyer may not be successful for another. Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel. We have recently observed that there are a few [sic], if any, cross-examinations that could not be improved upon. If that were the standard of constitutional effectiveness, few would be the counsel whose performance would past [sic] muster.[153]

With this deferential standard in mind, the Court considers Petitioner's claim that his counsel's cross-examinations of Cheyne and Gloria were constitutionally deficient.

---

[152] *Strickland,* 466 U.S. at 687.

[153] *Henderson*, 118 F.3d at 1287 (omitting citations and internal quotations).

##### 1. Gloria Kehoe

Gloria testified for several hours over the course of two days.[154]  The Court has reviewed the entire transcript of her testimony, both on direct and cross.  The Court concludes that counsel's cross-examination of Gloria was well within the scope of a constitutionally effective cross-examination.

Petitioner contends that his counsel were ineffective for failing to adequately cross-examine Gloria on her assertion that he and Lee "waited around a few days after the murders" in Arkansas for media reaction, rather than hurrying back to Spokane.[155]  The Government responds that Gloria gave no such testimony.  Rather, she testified on direct examination regarding the Spokane City Hall bombing that Kehoe and Lee placed the bomb, then drove to a hill above City Hall, and then sat watching to see how officials would react.

In his Reply, Petitioner asserts that in a March 31, 1998 interview of Gloria by law enforcement officers, she stated that Kehoe and Lee, "waited around a few days" after the Muellers were murdered for media reaction, but was never questioned about this statement on the record.  Petitioner argues that this statement destroys the Government's time line.

To determine what Gloria actually said, the Court ordered Petitioners Kehoe and Lee to produce a transcript of the interview.[156]  The transcript reads in pertinent part:

> AD:[157]  Did he tell you how long they were in, uh, close to the MUELLERS house before they actually took 'em down?  Were they there for a day or two?  Did they scope things out?

---

[154]  Tr. 4948-5209.

[155]  Am. Mot., at p. 29.

[156]  Order dated May 15, 2008, Doc. No. 1154.

[157]  "GK" stands for Gloria Kehoe. Based upon the Government's response, it appears that "AD" stands for "Aaron Duvall," a Deputy Sheriff.  *See* Doc. No. 1160, p. 1 n.1.

GK:  No.  No, from what I understood he said that uh, the job was done and they took 'em and then they rode around in the Wagoneer to, for the, to see what came in the paper.  See if the MUELLERS would come up missing or . . . In other words how the media would handle it.

AD:  They rode around in the Wagoneer?

GK:  That's why I'm, that's what I believing he said.

AD:  So they stayed in that area for a while?

GK:  I'm not sure if it was that area or the outside of that area.  I can't be quoted on that.

AD:  Did he tell you where he and DANNY went right after they disposed of the bodies?  Where did they go?

GK:  You know, I was in shock by then.

AD: Mm mh (affirmative).

GK:  I'll be very honest with you.  I believe they just headed straight back to Spokane.  I just remember him saying that they hung around for a few days.  That could have been at DANNY'S mother's house and then they came back to Spokane.[158]

The Government contends that Gloria was momentarily confused about the Spokane City Hall bombing and the Mueller murders, and that the follow-up questions establish that she was aware of this confusion.  Additionally, Gloria made it clear that she was unsure about her son's remarks, and ultimately stated that she believed "they just headed straight back to Spokane."  Thus, it appears that even if trial counsel had questioned Gloria about the statement, she would have been easily rehabilitated by the Government.

Petitioner also contends that his counsel were ineffective for failing to impeach Gloria for her failure to disclose, during her prior statements to law enforcement and her grand jury

---

[158]  Doc. No. 1159-4, at pp. 66-67. Petitioner initially submitted a transcript at Doc. No. 1157-2, at pp. 105-06.  Although the two transcripts submitted are not identical, the slight variations between the relevant portions of the two transcripts are not substantive and do not change the analysis.

testimony, some or all of the details of the Mueller murders which Kehoe allegedly confessed to her.  Petitioner fails to provide any detail regarding the alleged prior inconsistent or incomplete statements.  The Government contends, and Petitioner has failed to controvert, that a review of the statements establishes that all issues upon which Gloria testified at trial had been previously disclosed in her prior statements.  Additionally, Petitioner's counsel, in his sworn affidavit, establishes that all of Gloria's prior statements were reviewed and that the information obtained was used extensively in her cross-examination.[159]   Petitioner has not come forward with any evidence that Gloria's trial testimony was inconsistent with any of those additional prior statements.

Petitioner further contends that his counsel were ineffective for not eliciting on cross-examination the factual details related to an incident during which Kirby ordered Petitioner Kehoe to kill one of his younger brothers to punish him for abusing one of Kehoe's children.[160] Kehoe refused to kill his brother, but instead gave him a lashing.  Petitioner contends that Gloria was outraged by the abuse and that she consented and encouraged Petitioner to kill his younger brother.  Petitioner also argues that his trial counsel were ineffective for failing to call Gloria, Kirby, or the younger brother as defense witnesses to offer evidence regarding this incident.

The Court addressed this issue in two bench conferences while Gloria was testifying in the Government's case-in-chief.[161]  The parties disputed the relevance of this line of questioning.  The first bench conference was conducted at the conclusion of Gloria's testimony on April 7,

---

[159]  Affidavit of Mark Hampton, Exhibit A to Govt.'s Resp., at ¶ 9.

[160]  Petitioner expounds on this argument in a Supplement to his Amended Motion, filed under seal.  Doc. No. 1066.  The Supplement was filed under seal in part to protect the identity of the minor children.  The Court purposefully has not revealed identifying information regarding this incident.

[161]  Both bench conferences were transcribed and filed under seal.  *See* Docket No. 692 (April 8, 1999) and Docket No. 693 (April 7, 1999).

1999.  The second bench conference was conducted the next morning before Gloria resumed her testimony.  After initially ruling that the evidence was not proper cross-examination because it did not impeach Gloria, the Court subsequently altered its ruling and permitted defense counsel to ask the following three questions of Gloria:

>    (1) Did she ever hear Kirby order Chevie to kill anyone?;
>
>    (2) (Assuming he did), to your knowledge, did Chevie kill that person?; and
>
>    (3) Did she take any action to stop her husband?[162]

While the Court limited the testimony as noted on cross-examination, it pointed out that the defense was free to revisit the issue during its case-in-chief.

Lee's counsel asked Gloria the above questions during cross-examination.  Gloria acknowledged that Kirby had ordered Chevie to kill someone, but that Kehoe refused to do so.[163] Defense counsel did not, however, call Gloria during their case-in-chief to attempt to elaborate on or to further explain this incident.

The defense elicited this evidence, to the extent that the Court permitted it, during cross-examination.  The Court can only assume that the decision not to attempt to elaborate on the issue further during the defense case was a tactical decision.  To question this decision would only be to second-guess defense counsel's strategy, which the law does not permit.   While Petitioner may argue that such evidence was relevant to demonstrate the extent of Kirby's control and authority over the family and to contradict the Government's theory that Chevie Kehoe was the ringleader of the enterprise, an equally compelling argument may be made to the contrary. That Chevie could disobey Kirby's order to kill a sibling could likewise be viewed as

---

[162] Doc. No. 692, at pp. 13-14.

[163] Tr. 5205-06.

demonstrating Kirby's lack of control over Chevie.   There simply is no basis for concluding that defense counsel were ineffective for not presenting more of this evidence during the trial.

Finally, even if it could be said that counsel's cross-examination of Gloria was constitutionally deficient, Petitioner suffered no prejudice because it would not have altered the result.  Petitioner's assertion that "the issue regarding who killed the Mueller family was closely contested" is simply not accurate.  Defense counsel effectively used what they had to work with in an effort to create reasonable doubt.  They were, of course, limited by the facts.  Admittedly, Gloria was an important prosecution witness.  She was a difficult witness to cross-examine because of the fact that she testified convincingly, consistently with her prior statements, and, perhaps even more importantly, because she was testifying against her own son.

### 2.    Cheyne Kehoe

The Government argues that this contention is time-barred because Petitioner failed to assert that his trial counsel failed to adequately cross-examine Cheyne in his original motion. The Court agrees.  The only allegations in the original motion regarding Cheyne relate to allegations of failure "to investigate and determine."  The original motion does not assert that the cross-examination of Cheyne was deficient or lacking.

There is one factual issue that Petitioner raised both as a specific allegation in the context of  his "failure to investigate and determine" claim in his original motion and as a specific allegation in the context of his  "failure to effectively cross-examine" claim in his amended motion.  In his original motion, Petitioner asserts that his trial counsel were ineffective for failing to investigate and determine how Cheyne knew when he turned himself in that a blue paint chip had been found on the Mueller bodies.  In an early interview, Cheyne stated, "So I knew you would want to see Chevie's truck, that's why I brought it in."  In his amended motion, Petitioner

asserts that his trial counsel failed to effectively cross-examine Cheyne regarding his knowledge of the blue paint chips and how he knew to bring the paint chips to law enforcement when he turned himself in.  The claims may relate to the same underlying facts, but a failure to investigate claim is fundamentally different in type than an inadequate cross-examination claim. Accordingly, it cannot be said that the facts alleged in the original motion were sufficient to put the Government on notice that the cross-examination of Cheyne was also at issue.[164]

Additionally and alternatively, the Court finds that the cross-examination of Cheyne was clearly adequate under the *Strickland* standard.  Cheyne knew that his brother had used his then blue truck to transport the Mueller bodies after he murdered them.   It was reasonable and rational for Cheyne to believe that the authorities would be interested in examining any evidence he had, including the vehicle used to transport the Muellers' bodies.  Petitioner's suggestion that Cheyne must have known something about a blue paint chip being found with the bodies is unsupported.  Accordingly, his counsel's failure to explore this issue on cross-examination does not rise to the level of ineffective assistance of counsel.  Additionally, Petitioner has failed to demonstrate prejudice as a result of his counsel's allegedly inadequate performance.  This claim is both untimely and without merit.

### D.      Failure to Timely Object to Improper Closing Argument

Petitioner argues that the Government improperly vouched for the truthfulness of Gloria Kehoe during closing argument and that his counsel erred by failing to object to such argument at trial.  The Eighth Circuit considered this argument on appeal.  Reviewing the comments for plain error in light of counsel's failure to object at trial, the Eighth Circuit concluded, "[a]lthough the

---

[164]  *See Hernandez*, 436 F.3d at 857-58 (finding that claim of ineffective assistance of counsel on cross-examination did not relate back to the claim for ineffective assistance of counsel for failure to object to admission of evidence contained in original motion).

now-objected to comments may in part have run afoul of the rule that the prosecutor is not permitted to vouch for the truthfulness of a witness, we conclude that they did not rise to the level of plain error."[165]

In support of his argument, Petitioner references the following portions of the Government's closing argument :

> The best proof we have is - and it's Gloria Kehoe who told you. You remember Gloria's testimony.  And if there's one thing that comes out of her testimony, it was that she didn't think much of Kirby Kehoe anymore.  She turned him in up in Washington.  And he is serving a prison sentence right now because of what she did. And I really believe, if she could have, would have a lot rather blamed this murder on her husband, Kirby, than her son Chevie. But I think she did what she had to do, which was come in here and tell you folks the truth.  If she could have in good conscience blamed Kirby Kehoe, she would have.  But she couldn't because she knew where he was during the time of the Mueller murders. He was in Arizona.  She left him in February and went back to the Shadows Motel.  She left a child with him.  Remember her testimony that he brought one of the children on up a few days later?  If Kirby Kehoe made this magic trip over to Arkansas and did the murders, as Mr. Hampton was alleging yesterday during that interim period after Gloria left and went back to Washington state, he brought a young child with him because he had the child.[166]

Petitioner argues that by the above comments, the Government improperly vouched for Gloria's truthfulness, thereby enhancing her credibility and seriously prejudicing the defense theory that Kirby, rather than the Petitioner, committed, or was involved, in the Mueller murders. Petitioner also contends that such comments argued evidence not in the record – that Gloria would have rather implicated her husband, Kirby, in the crimes rather than her son, Chevie.

---

[165]  *Kehoe*, 310 F.3d at 594 (omitting citation).

[166]  Am. Mot., at p. 48, citing Tr. 6958-59 (emphasis added by Petitioner).

In response, the Government argues that the comments were not improper, and also, that even if they were, any error was trivial.  Based upon the evidence presented during the trial, the Government contends that it was reasonable for the jury to infer that Gloria would have preferred to blame Kirby for the Mueller murders, but she could not do so because she knew that Kirby was in Arizona at the time of the murders and that Kehoe and Lee had each confessed to her that they were the ones who murdered the Muellers.  Gloria in her testimony described her relationship with Kirby, explaining that she had turned on him because she feared for her life since, "she knew too much."[167]  During the trial, Gloria, while on the stand looked at her son, and said, "I love you, Chevie."[168]

Closing arguments should be limited "to the facts in evidence and reasonable inferences flowing therefrom."[169]  The Court finds that the comments in question did not argue evidence not in the record.  Further, it is doubtful that such comments crossed the line in vouching for Gloria's credibility.  The Eighth Circuit has held that a prosecutor's "characterization of the witness' testimony as believable in its context refers to the witness' manner of testimony in court before the jury.  Such description of testimony does not constitute error for it neither puts the prosecutor's own credibility before the jury nor does it carry any inference of outside knowledge."[170]

The allegedly improper comments must be viewed in the context of the evidence and the closing argument itself.  It is important to recognize that the allegedly improper comments were

---

[167] Tr. 4980.

[168] Tr. 4971.

[169] *United States v. Ojala*, 544 F.2d 940, 946 (8th Cir. 1976).

[170] *United States v. Dawkins*, 562 F.2d 567, 569 (8th Cir. 1977).

made during rebuttal, in response to Petitioner's counsel's assertions that Kirby could have murdered the Muellers because he had no alibi on where he was at the time of the murders and that Gloria had chosen to implicate Chevie rather than Cheyne because "she couldn't save all her children."   In light of such testimony, the Government was entitled to point out that Gloria had implicated Chevie rather than Kirby or Cheyne and to argue the believability of such testimony. Such argument was not based on counsel's personal opinion or outside knowledge, but rather, on the manner in which Gloria testified at trial.   Accordingly, the Court concludes, under all of the circumstances, that such rebuttal argument did not cross the line.

Finally, even if such comments were improper, Petitioner's failure to object to said comments does not satisfy *Strickland's* prejudice standard.   While Petitioner correctly notes that prosecutorial misconduct in closing arguments may result in the reversal of a conviction, Petitioner's claim here is not for prosecutorial misconduct, but for his counsel's failure to object to the improper statements.   Moreover, the Eighth Circuit has already found that such comments "did not rise to the level of plain error."[171]

"The standard for prejudice under *Strickland* is virtually identical to the showing required to establish that a defendant's substantial rights were affected under plain error analysis.   In both instances, the party challenging a conviction must show a reasonable probability that absent the alleged error, the outcome of the proceeding would have been different."[172]   Just as Petitioner failed to show plain error on direct appeal, he has also failed to show prejudice under *Strickland*. The Court specifically finds that to the extent the allegedly improper statements rise to the level

---

[171] *Kehoe*, 310 F.3d at 594.

[172] *Becht v. United States*, 403 F.3d 541, 548 (8th Cir. 2005) (omitting citations).

of improper vouching for witness credibility, such "vouching," viewed in context, was trivial and could not possibly have altered the verdict in this case.

### E.    Inadequacies in Connection with Jury Selection

Petitioner argues that his counsel were ineffective in pursuing a strategy to seat a minority-dominated jury panel.  Petitioner also argues that his counsel erred by not seeking a change of venue.[173]

The jury's racial composition was 9 blacks and 3 whites.  The defense elected not to use any of its peremptory challenges to remove black jurors from the panel.[174]  Petitioner's trial counsel acknowledges that "[s]electing a jury with as many blacks as possible was a strategic decision made by defense counsel."[175]  Defense counsel explains the rationale for pursuing such a strategy.  Whether right or wrong, counsel believed that African-American jurors would be better for the Petitioner both on the guilt issues and (if convicted) on the punishment issues. Further, defense counsel states that this strategy was discussed in a general fashion with Petitioner and was not objected to by Petitioner.  The strategy was also approved by the professional consultant retained to assist with jury selection.

The Court may not second guess defense counsel's trial strategy.  The Court can not say that defense counsel's jury selection strategy fell below an objective standard of reasonableness. Additionally, Petitioner has failed to demonstrate prejudice as a result of such strategy.  With

---

[173]  Petitioner's argument that his counsel erred in not inquiring about the specific racial bias of prospective jurors was asserted for the first time in his amended motion and is time-barred.

[174]  The apparent defense strategy to seat as many black jurors as possible, apparently by using peremptory strikes only as to white jurors, could have been challenged as unconstitutional.  The Constitution "prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges." *Georgia v. McCollum*, 505 U.S. 42, 59 (1992).  However, while race-based jury selection offends the constitutional rights of the <u>jurors</u> who are eliminated from serving jury service because of their race, it does not offend <u>Petitioner's</u> constitutional rights.

[175]  Affidavit of Petitioner's Trial Counsel, at ¶ 4.

respect to all of Petitioner's challenges to jury selection, composition and venue, the Court

concludes that Petitioner has failed to satisfy either *Strickland's* performance or prejudice prongs.

###    F.    Failure to Make a Full and Reasonable Investigation

While Petitioner has many ideas on additional investigation that should have been

undertaken, he has failed to identify the particular facts that would have been elicited as a result

of such additional investigation or to show that the presentation of such facts at trial would have

altered the guilty verdict.[176]

Petitioner includes a litany of allegations to support the theory that defense counsel's

investigation was inadequate.  In the original motion, such claims are framed in terms of

counsel's alleged failure to conduct "an adequate investigation into Kehoe's innocence."[177]  The

petition then lists twenty-two (22) specific points which were allegedly inadequately

investigated.  The amended motion expands on this claim, framing it in terms of failure to make

a full and reasonable investigation and to present evidence in defense.  The amended motion

overlaps in part with the original motion.  Some of Petitioner's claims have already been

discussed in the context of other issues; others are time-barred.  To the extent allegations are

summarily asserted, but not unsupported by any argument or independent evidence, the Court

will not discuss such allegations further, but finds them to be without merit.  The Court further

holds that each and every assertion of inadequate investigation fails for the independent reason

---

[176]  *See, e.g., Williams v. United States*, 452 F.3d 1009, 1013-14 (8th Cir. 2006) (finding no prejudice when an alleged alibi witness did not testify and the court could not conclude the missing witness's testimony would have altered the outcome of the trial).

[177]  Orig. Mot., at pp. 35-39.

that Petitioner has failed to demonstrate prejudice.  "If the defendant cannot prove prejudice, we need not address whether counsel's performance was deficient."[178]

Those allegations meriting discussion are identified and discussed below:

### 1.     Failure to Investigate Paul Humphrey and Others

In his original motion, Petitioner alleged that trial counsel were inadequate for failing to "investigate and determine why Paul Humphrey tried to have Bill Mueller's truck registered in his name and to document a connection between him and Kirby Kehoe."[179]  In his amended motion, Petitioner greatly expands on this claim, suggesting the trial counsel should have investigated Humphrey and others, including Timothy Combs, David and Sylvia Mason, Bobby Hulse and Drew Raines.  Petitioner asserts that such individuals had "potential relevant and exculpatory evidence" but he fails to identify what that evidence would have been.  All allegations other than those contained in the original motion are time-barred.

The contentions raised in the original motion are lacking in merit.  Paul Humphrey was called to testify at trial by Petitioner.  Petitioner's trial counsel attempted, but failed, to establish a link between Humphrey and the death of the Muellers.  He was questioned in detail about the circumstances under which he acquired the title to Bill Mueller's jeep and the fact that he attempted to have the title transferred to him.  Humprhey was also questioned regarding whether he knew Kirby Kehoe.  He denied knowing Kirby.

Petitioner has failed to identify the evidence that the allegedly necessary additional investigation would have uncovered.  Petitioner has not demonstrated that Humphrey knew

---

[178]  *DeRoo v. United States*, 223 F.3d 919, 925 (8th Cir. 2000).

[179]  Orig. Mot., at p. 36.

Kirby.  Nor has Petitioner come forward with any evidence that Humphrey, or any other person, played any role in the death of the Muellers.

### 2.        Failure to Investigate and Determine Kirby Kehoe's Whereabouts

In his original motion, Petitioner contends that his trial counsel were ineffective for failing to question witnesses "as to Kirby's alibi that he was helping to build a pole barn in Arizona for a friend" during the time frame of the Mueller murders.[180]   In a sworn affidavit, one of Petitioner's trial attorneys states that defense counsel and their retained investigators did in fact investigate whether Kirby was in Arizona, as he claimed, at the time the Muellers were murdered.  They found many people who would assert that Kirby was in Arizona during this time-frame.[181]  The Court agrees with the Government that Petitioner's "trial counsel wisely did not emphasize during their case that Kirby was the murderer."[182]   The Government was prepared to present significant additional proof to establish that Kirby was in Arizona at the time of the murders.  Because of the strategy they pursued, Petitioner's counsel were able to argue during closing that Kirby (and others) could have committed the murders without opening the door to the Government's presentation of substantial contrary evidence on rebuttal.  And, as the Court has already noted in discussing the fact that there is no actual innocence claim before the Court, Petitioner has failed to present any evidence, newly discovered or otherwise, which would actually place Kirby in Arkansas during the time of the Mueller family murders.

---

[180]  Orig. Mot., at p. 37, ¶ 10.

[181]  Affidavit of Pet.'s Trial Counsel, Exh. A to Response at ¶ 12.

[182]  Response, at p. 34.

### 3. Failure to Find Witnesses to Vouch for Petitioner's Whereabouts on January 11, 1996

Petitioner contends that his trial counsel "failed to investigate and present witnesses in Oklahoma who could vouch" for Petitioner and Co-defendant Lee's "whereabouts on or around January 11th or later."[183]   Lee's mother's testimony established that she gave Petitioner and Lee $40 about 6:00 p.m. on January 10th so that they could return to eastern Washington.[184]

Petitioner's trial counsel recognized the importance of this issue and attempted to locate witnesses on the key issue of Petitioner and Lee's whereabouts on January 11th.[185]   They simply were not able to find any such witnesses.

Petitioner has failed to present any witnesses or other factual evidence to show that he was in Oklahoma (or in any location other than Arkansas) on January 11th.  His counsel can not be faulted for failing to discover witnesses or evidence that are not shown to exist.

### 4. Failure to Investigate and Present Evidence Related to Kirby Kehoe

Petitioner contends that his counsel erroneously failed to investigate Kirby's naval records.  This allegation is disproved by Petitioner's trial counsel, who states that Kirby's naval records were reviewed prior to trial.[186]  Petitioner has not challenged or refuted the affidavit. Additionally, Petitioner has failed to present any evidence that could and should have been elicited from such review or to demonstrate that it would have altered the outcome of the trial.

Although Petitioner's other contentions about Kirby are time-barred, the Court notes that they are also without merit.  For example, Petitioner contends that his defense counsel should

---

[183]  Am. Mot., at p. 42.

[184]  Tr. 2613-19.

[185]  Affidavit of Pet.'s Trial Counsel, Exh. A to Response at ¶ 18.

[186]  Affidavit of Pet.'s Trial Counsel, Exh. A to Response at ¶ 17.

have emphasized Kirby's leadership personality by pointing out that he dropped off Faron

Lovelace so that he could commit the Friedman crimes and that he led the APR (assuming it

existed).  Such evidence, Petitioner contends, would have enabled his counsel to contrast the

personalities and actions of Kirby and Chevie.  Such evidence would have only been helpful to

the defense, however, if they had pursued the strategy that Kirby had committed the Mueller

murders.  This was not the primary defense strategy, and, for the reasons previously noted in this

opinion, there is no evidence that such a strategy could have succeeded.

### 5.    Failure to Discover or Present Evidence of Financial Solvency

Petitioner faults his counsel for failing to develop and present proof that he had access

from legitimate sources to the $10,000 in cash used to purchase a motor home shortly after the

Mueller murders.  Petitioner has failed, however, to identify any witness who would so testify.

All proof at trial indicated that Kehoe was broke prior to robbing and murdering the Muellers.

Petitioner's trial counsel, in his affidavit, indicates that Kehoe stated that he obtained the $10,000

from trading in cash at gun shows, but defense counsel knew of no way to trace funds obtained in

this manner.[187]  Once again, counsel can not be faulted for failing to discover and present

evidence that Petitioner himself has not been able to present.

### G.    Failure to Seek Additional Physical Evidence or Additional Forensic Testing

The only claims of this nature asserted which are not time-barred are the Faron Lovelace

allegations and the alleged failure to obtain a forensic examination of the rocks found upon the

recovery of the Muellers' bodies.  The Court has previously discussed and rejected the

allegations regarding Faron Lovelace.  *See* discussion, *supra*.  With regard to the allegation that

trial counsel should have obtained a forensic examination of the rocks duct taped to the three

---

[187] Affidavit of Pet.'s Trial Counsel, Exh. A to Response at ¶ 7.

victims' bodies prior to being thrown in the Illinois Bayou or paint flecks transferred to the duct tape, Petitioner has failed to demonstrate what such examination would have shown or how it would have benefitted the defense.

### H.      Failure to Permit Petitioner to Testify

Petitioner contends that his trial counsel were ineffective because they intimidated and coerced him into not testifying on his own behalf.  Petitioner argues that he repeatedly expressed to his counsel his desire to testify in response to which counsel repeatedly dissuaded him by scaring him "into believing he would suffer the death penalty if he testified."[188]  Prior to the start of closing arguments, Petitioner personally sent a note to the Court expressing his desire to testify.  The Court held a hearing in chambers to address the note.  Petitioner claims he "felt helpless and unable to adequately present the reasons he wanted to testify in the presence of the learned judge and counsel for all parties."[189]  Petitioner acknowledged that he did not thereafter ask to testify, but he claims that he "acquiesced to his counsel's desire that he not testify."[190]  Petitioner further contends that there is a reasonable probability that, but for his counsel's intimidation and coercion, he would have testified and the outcome of the trial would have been different.

The Government correctly points out that this issue is time-barred because it was not raised in the original Motion.  The Court elects to address the issue on the merits as well.

On the morning closing arguments were to commence, Petitioner sent a note to the Court through the court security officer.  After reading Petitioner's note, the Court conducted a private

---

[188]  Am. Mot., at p. 55.

[189]  *Id.*

[190]  *Id.* at 56.

on the record conference with Petitioner, honoring his request to exclude his counsel.  The Court later expanded the conference to include Petitioner's counsel with Petitioner's permission.  The entire conference (with and without counsel) was transcribed and the transcript placed under seal.  The Court has reviewed the transcript of the conference.

The Court rejects Petitioner's assertion that he was intimidated into not testifying by his counsel.  First, this allegations is wholly inconsistent with Petitioner's demeanor during trial, which indicated that he was more than capable of making his wishes known and not shy about doing so.  Second, it is disproved by the record.  The Court specifically permitted Petitioner an additional opportunity to discuss with his lawyers whether he wanted to testify prior to proceeding with closing argument.  The Court then brought Petitioner and his counsel back for Petitioner to announce his decision.  Petitioner announced to the Court, with counsel present, that he was standing by his earlier decision not to testify.  There simply is no doubt that Petitioner could have testified if he had chosen to do so.   The assertion that Petitioner was intimidated by his counsel (or anyone else) into not testifying is simply unsupported and contrary to the record.  Additionally, in this Court's view, the decision not to take the stand was based on sound and prudent advice in light of the damaging cross-examination that Petitioner would have been subjected to.  There is certainly no evidence that the outcome of the trial would have been different, in a good way for Petitioner, if he had testified.  In fact, if he had elected to testify he might well have ended up with a death sentence instead of the life sentence he received.

## IV.     DENIAL OF SIXTH AMENDMENT RIGHT TO CONFRONTATION

Petitioner argues that his Sixth Amendment rights were violated by the admission of certain statements.  Petitioner cites *Crawford v. Washington*[191] and *Ohio v. Roberts*.[192]  With its decision in *Crawford*, the Supreme Court overruled *Roberts* and established a new rule for the admission of testimonial statements of unavailable witnesses in criminal trials.  However, in *Whorton v. Bockting*.[193] the Supreme Court held that the rule announced in *Crawford* is not to be applied retroactively on collateral review.

Petitioner's direct appeal was complete in November of 2002 and his certiorari petition was denied on May 19, 2003, well in advance of the *Crawford* decision, which was announced on March 8, 2004.  Accordingly, the *Roberts* decision controls the analysis of Petitioner's Confrontation Clause claims.[194]  Under *Roberts*, a hearsay statement by an unavailable declarant may be admitted without violating the Confrontation Clause if the statement falls within a firmly rooted hearsay exception.  Otherwise, the statement must be excluded, "at least absent a showing of particularized guarantees of trustworthiness."[195]

Relying on *Bruton v. United States*,[196] Petitioner also contends that the Court's limiting instructions, directing that certain out-of-court declarations by co-defendant Lee were admissible

---

[191]  541 U.S. 36 (2004).

[192]  448 U.S. 56 (1980).

[193]  127 S.Ct. 1173 (2007).

[194]  It is interesting to note that application of the *Crawford* decision would provide Petitioner less, not more, protection.  The new rule pronounced in *Crawford* specifically applies only to testimonial statements.  All of the statements of which Petitioner complains are nontestimonial in nature.  Thus, in the post-*Crawford* evidentiary world such statements would be admitted without the necessity of a *Roberts*' judicial determination regarding reliability.  *Whorton*, 127 S.Ct. at 1183.

[195]  448 U.S. at 66.

[196]  391 U.S. 123 (1968).

only against him and not Petitioner, were inadequate.  Finally, Petitioner argues that the Court's

limiting instructions were deficient, that counsel were ineffective for failing to adequately object

to the introduction of the statements at trial, and that counsel were ineffective for failing to object

to defective jury instructions advising the jury that Petitioner could not compel Lee to testify.

Petitioner contends that statements violative of the Sixth Amendment were admitted

through the testimony of  witnesses David Lynch, Gloria Kehoe, James Wanker, Dalvine

Wanker, Sean Haines, and Jack Price.

David Lynch testified that Lee told him he was "doing militia-type activities, things

similar to The Order, that they would be making history."[197]  This statement was made in the

context of Lee's recruitment of Jon Cox into the APR.  Lee's statement to Lynch was therefore

nonhearsay pursuant to Fed. R. Evid. 801(d)(2)(E).[198]  Admission of this statement did not violate

the Confrontation Clause because the statement fell within a firmly rooted hearsay exception.

Gloria Kehoe testified that Lee told her that William Mueller was tough because he

fought so hard and that Nancy Mueller was dumb because she thought it was a real raid and

helped put the bag on her head.[199]  Petitioner challenged this same testimony on direct appeal.

The Eighth Circuit agreed with this Court that such statements were effectively Petitioner's own

statements because he had adopted them.[200]  Claims raised and lost on direct appeal may not be

relitigated in a petition for relief pursuant to 28 U.S.C. § 2255.[201]

---

[197] Tr. 4416.

[198] This provision establishes that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay.

[199] Tr. 4975.

[200] *Kehoe*, 310 F.3d at 590-91.

[201] *Dall v. United States*, 857 F.2d 571, 572 (8th Cir. 1992).

James Wanker[202] testified that Lee told him in July 1996 that on a trip down South somebody had "fucked with him and so he wrapped them up, taped them and through [sic] them in the swamp."[203]  Dalvine Wanker testified that Lee once told her he had a firearm and was not afraid to use it in response to her concerns about some allegedly dangerous persons in the park. She further testified that Lee had told her that some people "had fucked with him, and that he had taken care of it."[204]  In his actual statements, Lee purportedly used "we" to describe wrapping, taping, and throwing victims in the swamp.  At trial, the incriminating "we" was changed to "I."[205]  The Supreme Court has recognized that redacting a non-testifying co-defendant's confession to eliminate any reference to another defendant's existence may be adequate to "Brutonize" a statement.[206]  Additionally, the Court properly instructed the jury about the statements, directing that they could be considered only as evidence against Lee and not against Petitioner.

Sean Haines, a paid FBI informant who provided information regarding Klan activities, testified that he met Jon Cox at a skinhead concert in Pennsylvania and that he later saw Lee and Cox together at the Shadows Motel in July of 1996.  Haines testified regarding Cox's subsequent disappearance and to Lee's statement that "that loudmouthed punk ain't coming back."[207]  Jack Price met Lee in jail at Russellville, Arkansas.  Price testified that he tattooed Lee with a wolf's

---

[202]  Mr. Wanker lived at the Shadows Motel at the same time that Petitioner, his family, and Danny Lee were also living there in a motor home.

[203]  Tr. 4078-79, 4081-82, 4091.

[204]  Tr. 4093.

[205]  Tr. 4082.

[206]  *Gray v. Maryland*, 523 U.S. 185, 191-92 (1998) (discussing *Richardson v. Marsh*, 481 U.S. 200 (1987)).

[207]  Tr. 2801-02.

hook that Lee said was a symbol of the APR.[208]  Because the statements complained of do not

implicate Petitioner, *Bruton* does not apply.[209]

The Court also rejects Petitioner's remaining arguments.  There was no constitutional

infirmity in the Court's jury instructions.  On this point, the Court notes that the Eighth Circuit

rejected several such alleged errors asserted by Petitioner on direct appeal.[210]

## V.      DENIAL OF A SEVERANCE

Petitioner argues that he was deprived of a severance due to the Government's failure to

identify the Wankers as witnesses prior to trial.  Petitioner argues that the Wankers testified to

statements made by Lee that were highly similar to statements that Gloria Kehoe also attributed

to Lee.  At trial, the Court ruled that Lee's statements made to Gloria were admissible against

Kehoe, but that Lee's statements made to the Wankers were not admissible against Petitioner.

The Court instructed the jury not to consider Lee's statements to the Wankers against the

Petitioner.  Petitioner contends he was prejudiced by the admission of inadmissable evidence

(from the Wankers' testimony) that supported and corroborated the admissible evidence (from

Gloria Kehoe).

First, this issue was not raised in the original motion.  Thus, the issue is time-barred.

Second, even if the Court were to consider the issue on the merits, it would not justify collateral

relief.  The Court specifically finds that Petitioner was not prejudiced because the Court would

not have severed the trials, even if it had been advised of the Wankers' anticipated testimony

prior to ruling on Petitioner's request for a severance.  Finally, the Court notes that Petitioner

---

[208]  Tr. 4110-15.

[209]  *United States v. Escobar*, 50 F.3d 1414, 1422 (8th Cir. 1995).

[210]  *Kehoe*, 310 F.3d at 594-94.

argued on appeal that he was prejudiced by the district court's refusal to sever his trial from

Danny Lee's due to the admission of out-of-court statements by Lee.  The Eighth Circuit rejected

this contention.[211]  This claim, having been raised and lost on direct appeal, is not appropriate for

post-conviction relief.[212]

## VI.    CUMULATIVE ERROR

Petitioner argues that the combined effect of all the alleged deficiencies in his counsel's

performance warrants collateral relief.  The Eighth Circuit has rejected the "cumulative error"

doctrine.[213]

While other Circuits have recognized "cumulative error" as a valid theory justifying

habeas relief, the Eighth Circuit does not.  This Court, of course, is bound by Eighth Circuit

precedent.  Even if the "cumulative error" doctrine were available to Petitioner, this Court

concludes that all the errors alleged by Petitioner, in their cumulative effect, would not justify

any relief.  The Court specifically rejects Petitioner's argument that errors committed by his

counsel "undermine the confidence in the outcome of his trial."  After reviewing the trial

transcript and the record in this case, the Court is convinced that Petitioner was the beneficiary of

professionally competent legal assistance at all times.

### CONCLUSION

After considering Petitioner's claims for relief, the record, and the applicable law, the

Court concludes that Petitioner received a fair and constitutional trial.  Accordingly,

---

[211]  *Kehoe*, 310 F.3d at 590.

[212]  *See Dall*, 857 F.2d at 572.

[213]  *See United States v. Robinson*, 301 F.3d 923, 926 n.3 (8th Cir. 2002); *Hall v. Luebbers*, 296 F.3d 685, 692-93 (8th Cir. 2002); *Girtman v. Lockhart*, 942 F.2d 468, 475 (8th Cir. 1991).

IT IS HEREBY ORDERED THAT Petitioner's Motion to Set Aside, Reduce or Vacate Sentence under 28 U.S.C. § 2255 [Doc. No. 1039];  Petitioner's Amended Motion to Vacate, Set Aside or Correct Sentence [Doc. No. 1067];  and Petitioner's Supplemental Amended Motion to Vacate, Set Aside or Correct Sentence [Doc. No. 1069], be, and they are hereby, DENIED.  All claims asserted are hereby DISMISSED WITH PREJUDICE.

IT IS SO ORDERED THIS   28th   day of August, 2008.

_____
UNITED STATES DISTRICT JUDGE